After the first case, we have a change in the bench and I'll depart and Judge St. Eve will come in for the remaining five cases. Mr. Neal, good morning, whenever you're ready. Good morning, your honors. May it please the court, I'm Brian Neal for BNSF Railway, the appellant in this interlocutory appeal under 1292B. I'll start with the principal issue in the appeal, which is whether the district court's understanding of the regarded as having provision under the Americans with Disabilities Act disability coverage provision was a correct legal understanding. Everyone agrees that the statute requires an actual or perceived impairment. The district court held that an employer who is acting on the basis of a risk that a person who does not have an impairment but may in the future develop an impairment is acting on a perceived impairment and that view of the law is incorrect as a matter of law. The provision, the regarded as provision, requires either an actual impairment or a perception of an existing impairment. The employer has to perceive an impairment at the time it takes the action. It has to perceive it to exist. Three circuits have agreed with the state of the law as I've just described it, two of which, the 8th and the 11th, have done so in the course of expressly rejecting the very theory that the district court espoused in this case and the one that the EEOC is amicus in this case is advocating. One of those was the 8th circuit in the Morris decision that both sides have talked about extensively in the briefing and your honors know that that case involved the very employment practice that is at issue in this case. It is BNSF's practice with respect to elevated BMI for certain highly safety sensitive positions based on, not based on unfounded fears or myth, fear, and stereotype as is alleged by the other side in the EEOC but based on actual medical science. Another of the cases, the more recent, very recent decision by the 11th circuit in the spectrum because it is a case involving, unlike BNSF, an employer that actually did act on the unfounded concerns and stereotypes of the sort that the regarded as provision as a whole is aimed at, still the 11th circuit judges said even though it is within the parameters of what at a high level that provision is aimed at, the text does not permit a construction that would reach that employer's behavior. That was the employer that heard an employee was going to go to Ghana and became fearful that the employee would come back with Ebola even though there was no basis for thinking that whatsoever and the 11th circuit said, well, clearly unfounded fears and stereotypes but the statute doesn't reach that. Now, I want to be clear, we're not in that category because our decision was based on medical science but if that case is not covered, our case clearly should not be covered. And that is, and we've gone into great detail about this in the briefing, that the most clear in 1C and 3A, the most clear and natural reading of those provisions is that the perceived impairment language refers to a perception of a current impairment and that's not adding word. I'm sorry? No, I'm just going to say there's nothing in here that suggests obesity in itself is some sort of disability, is there? No, no, Your Honor, and that was early on in the case that was really the focus of the plaintiff's claim. It really was a more straightforward claim that BNSF failed to hire him on the basis of his obesity. This court in the Richardson case has since said that obesity is a physical characteristic, not an impairment and so that claim would go out the window and the district court did agree with us on that part of it even before this court's decision in the Richardson case. Would it matter, though, if we had a plaintiff who it was known was obese and the obesity had a physiological cause, if our starting point, in other words, was different? Sure, sure. How would the analysis differ? It depends on whether you adopted... So you have an applicant that shows up, right? Applying for the same job that the plaintiff did here and said, yeah, there's no question I suffer from obesity and it has a physiological cause. I've got a letter from my physician here. I've got a thyroid issue and I've struggled with this for years. Sure, and then let's say you have an employer who either acts directly based on that or is concerned that that will lead to some other conditions. Right, same and then hold the facts constant that we have here. Yes, that employer would be covered because that employer is acting on the basis of an actual impairment, which is, you know, we all agree and BNSF has never said that obesity, when it is the result of a physiological disorder, is not an impairment. So in that case, you have an impairment and employers acting on the basis of an actual impairment. Yeah, so our starting point here very much matters. Yes, yes. And it very much matters that the concerns that BNSF looks at arose not from an impairment but from a physical characteristic, not an impairment. The district court's rationale, you know, we argued all of this in the district court. The district court's rationale was essentially policy based that if the statute covers the other and that's not what we would say is the right way to look at the statute or to engage in the statutory construction. The EEOC's argument takes it a bit of a step further and does try to make a textual argument. It's for the most part just asserting that the language based on an actual or perceived physical or mental impairment, just focusing on that small phrase of the overall context, does encompass a perception that one may in the future develop an impairment. I don't read it that way, but that's really the only textual argument that the EEOC makes. The rest of it is policy based, either more general policy based or relying on Congress's intent in the 2008 amendments, which we don't dispute, to expand the statute to more broadly cover impairments and disabilities, but that doesn't mean without regard to the statutory text. And the court is, you know, Judge Gutter and Richardson addressed some of that and it was the same sort of thing that was addressed in the Morris case. Providing for a broad interpretation or a liberal interpretation doesn't mean interpretation with no limits. And that's really the crux of the EEOC's argument. There's one thing I wanted to point out in addition about the EEOC's argument. The agency has, since the original ADA in 1990, had regulations, a very thick set of regulations under the Act and appended to it an interpretive guidance. And that's a lot of what was interpreted in the Richardson case. The question about physical characteristic and so forth. After the 2008 amendments to the statute, the agency revamped the regulations, revamped the interpretive guidance, and in the interpretive guidance said, this interpretive guidance constitutes the agency's interpretation of the issues it addresses. One of those issues, of course, is what it takes to have a regarded as disability. You can scour those regulations and the interpretive guidance from top to bottom. You will not find the agency's theory that it states in its amicus brief anywhere in that interpretive guidance or the regulations. You will not find it mentioned. You will not find it hinted at. They make a decent point, do they not, though, drawing upon Title VII in an analogy to the anticipatory retaliation that's covered. I mean, that seems to be a fair argument. What do you say in response to that? A couple of points. I mean, the language in those cases is different. The more significant point, though, is that the Supreme Court in Nassar said very clearly, look, characteristics, as far as discrimination cases go, protected characteristics are an entirely different animal from protected activity. Courts should not just assume that the same principles that apply to one apply to the other. And so, I mean, that's really the basic response there. I mean, you can look at statutes and they do have some different language, but primarily it's that there's no warrant for expanding that concept to this concept and then when you add to it the fact that you can't get there with a statutory language. And in addition, this is an entirely new interpretation that the agency is making because it is nowhere in this. We've done these extensive interpretive guidance comments and it's nowhere to be found. You would think that if Congress, when they amended the statute in 2008, intended not only to eliminate the substantial limitation aspect of regarded as claims, which is what Congress intended to do, but also meant to say, oh, and by the way, we're now going to recognize perceptions not of current impairments, but perceptions of someone who may in the future become impaired, of course Congress would have said so more clearly, but also that the agency would have said something about that in its interpretive guidance. And the reality is you don't see the agency making that argument until you get to the STME case, and that's why, as we went through in our reply brief, you have so many inconsistent statements, inconsistent with their position here, statements by the agency in prior briefs, and you have the agency telling the Ninth Circuit directly, the statute reads exactly the way we say it reads. Now, I'll move off of EEOC briefly and go to Mr. Schell, who I understand to be making a bit of a different argument. I understand him to be saying that BNSF perceived him as though he already had certain medical conditions, sleep apnea, diabetes, and heart disease. Just right out of the gate, that argument fails because we've got a set of deemed admitted facts here, and we've given those to you in Appendix 39, and you can see in the district court's order where she said that those were deemed admitted. One of those is that Dr. Girard, BNSF's doctor, did not perceive Mr. Schell as having any impairment. So it should fail immediately to argue that he was regarded as already having one of those conditions. And the further problem with it is it confuses the – BNSF's action was not based on those three medical conditions. You're in your rebuttal time, you know. Sorry? I say you're in your rebuttal time. Oh, I'll wrap up my – thank you, Your Honor. I'll wrap up this comment and move on. BNSF's action was not based on those three medical conditions. It was based on risk factors, and there's a difference between a risk factor and a condition, and there are reasons that we've set out in the brief, and then the reasons for BNSF doing what it does, that are different than acting on the basis of the condition itself as opposed to the risk factors. And so that's another reason Mr. Schell's argument failed. So if there are no other questions, I'll preserve the remainder of my time for rebuttal. Okay, very well, Mr. Neal. Mr. Esposito, when you're ready. Good morning. Nicholas Esposito for the plaintiff, Ronald Schell. May it please the court. Interesting questions and comments by counsel. The case is not about obesity as an ADA disability per se. This is a fact-questioned case. The case is about those issues of fact. They're using obesity in our perception as a method to screen out what they immediately perceive to be physiological conditions, and there are distinct differences in our case versus the other cases. And with regard to your questions, Judge, I'm going to go right to both of them because I think they're interesting. If a physiological condition occurred, had already occurred or existed, that would be a current ADA disability claim. As Low indicates, there are four categories. There's past, current, perceived, and future. So the distinction between perceived and future, they want the court to believe that their comments are about the future. We believe Dr. Girard's comments and the letter that Mr. Schell got was about the present. And, Your Honors, I would ask you to look at the letter, the declination letter. Nowhere in that letter does it say we think in the future, we think you have potential, we think down the road. None of that in the letter. As a matter of fact, the letter then says, but come back. If you lose 10% of your weight, we'll take you back. Parenthesis, even if you're still obese. From our perspective, it's not obesity from their perspective. It's about trying to ferret out and screen out those other issues. If there was a concern about obesity, why would they even consider bringing him back after losing 10% of his weight and still be obese? It makes no sense. And they say, if you come back after losing 10% of your weight, parenthesis, and you're still obese, we'll screen you for a sleep app, or we'll give you sleep tests, we'll give you blood tests, we'll help you with all these other things that we think you have. Now, when we talk about Dr. Girard, interestingly enough, his comments are his direct comments. Now, we have the letter, which he approved, by the way. His direct comments about Mr. Schell are suddenly and unexpectedly could be incapacitated. Suddenly, swift, unexpected, imminently, sudden incapacitation, sudden imminent risk, serious impairment of alertness or cognitive activity. So I ask this question rhetorically. What is future? What is future? Is future they hire him, and the next minute, literally the next minute, he has a heart attack? What do they mean by future? These are the issues that Judge Coleman raised about issues of fact. What do they mean? Because the word future is nowhere to be found in any of the documentation that they gave us. Nothing. He has to be regarded as, though, right, as having a present covered disability. Yes. Right? Yes. And this was Class III obesity, and at least as I look at the record, there's nothing in there that, as it stands now anyway, that would suggest that it has a physiological cause. Dr. Girard felt it did. Dr. Girard testified that he studied obesity, and based on his studies, by the way, he was called as an expert in this case. He testified that based on his studies, obesity will cause or may cause these occurrences, these physiological occurrences. The evidence, I mean, it's not that in 100% of the cases where people have Class III obesity that it has a physiological cause and therefore necessarily be so with this plaintiff, right? I mean, you have to evaluate it case by case. Of course. Yes, Your Honor. I agree with you. But I think this case is factually distinguishable on many accounts here. Why bring him back? Why would they bring him back? What does that mean to their obesity reason? Why bring him back if he's still obese? Why? You're talking about bringing him back after he's lost 10% of his weight? Yes. Well, that's at best a future risk. It's not an existing problem. I don't know if it's a future risk. Well, I guess it is. I mean, if there's somebody, if the doctor's saying, well, this could happen, this other thing could happen, but so-called it hasn't happened and he doesn't have a present problem. And I think that's really where we, at least I think you're trying to say, well, it doesn't have to be present. It can be something, I don't know, I don't want to call it speculative or somebody's worried about it. I can only go by the words of Dr. Girard, Your Honor, where he says he could immediately have a heart attack. Yeah, but he hasn't had one. He doesn't have one. At the time of the letter he had, no, and they didn't hire him so he wouldn't know. But I'm just saying that he believed that there was a perceived immediate risk of him being a crane operator and having a heart attack or sleep apnea and falling asleep or diabetes and going into some diabetic coma. Well, there may be other reasons that somebody who's obese like he is isn't in the best ability to run a crane or get on and off of a vehicle or do something where you have to kind of be, I'll use the word nimble, where you have to be able to move about and et cetera. That's true. Someone who's obese and heavy has less of that, but it doesn't mean he has something presently wrong with him. It's just a matter of whether he can do a job like that that he's doing as well as someone else who doesn't have that weight. Mr. Schell was found to pass all tests, and when they interviewed him they said, you could teach us something. Dr. Girard testified that he would hire Mr. Schell, that he saw no reason not to hire Mr. Schell. Suppose, for example, you had an individual who was 30 years old and applied to drive a school bus and said, unfortunately, epilepsy runs deep in my family, and my physician told me that I'm at high risk of having epilepsy, and the onset coming in the very near future. But I'm treating that. I'm getting treatment for that. And the person has declined the offer to drive the school bus. They just don't get the job. Did they state a prima facie claim? That's a current risk. It's not a perceived as. That's a current risk. I would presume it would be deemed a current risk. Well, sure, there's a risk, but the statutory question is not, is there a risk, right? It says, are they regarded as having a condition that's presently covered as a disability? And so the person would say, no, not at all. I don't have epilepsy today. But it's an actual risk, not a perceived under your scenario. It would be an actual condition. At that moment, he discloses an actual condition. Well, here we have class 3 disability disclosed as an actual condition. And the prospective employer said, you know, we have concerns about the sudden onset of a few characteristics that would pose a real risk to safety should this gentleman work on the rail yard. What I'm saying is that epilepsy would be a current physiological condition. No, no, no. In my hypothetical, the applicant says, let's make no mistake, I do not have epilepsy. I see. I do not have it. But it runs deep in my family. And my physician has told me I'm at high risk for its onset. That would be actionable. It would. But it depends on what the language is that's used. I mean, if, you know, they have focused in their entire argument, even today, that it's about future conduct or future action. I'm just dealing with the facts at hand. I'm dealing with what the doctor said. I'm dealing with what the letter said. So if they're trying to sell him insurance, they can use the fact that he may drop dead tomorrow to deny insurance but not hire him. They'd have to hire him. Right. Okay. I get your point. Yes. So I think also with respect to ñ I just want to touch on a few other things here. With regard to Morris and Richardson, for example. In Morris, the defendant and plaintiff both agreed to the future possibility. That's the distinction in our case. They agreed to the fact that something could happen to Morris in the future. There's no testimony, no document that uses that language. In Richardson, kind of like your example of the bus driver, in Richardson, which this court has found does not apply or does not allow obesity to be an ADA condition, in Richardson we had a bus driver who was morbidly obese, could hit both pedals at the same time and stop and go at the same time. He couldn't do hand over hand. There were a lot of specific characteristics for him. And they deemed that he was obese and unable to perform his duties. That's different than here. There's no indication here that Shell could not perform his duties. As a matter of fact, they complimented him for it. Now you're into his time. Pardon me? I think I'm done. Thank you, Mr. Esposito. Mr. Horwitz, good morning. Good morning. May it please the Court, I'm Jeremy Horwitz with the EEOC. I'd like to start, if I could, Judge Scudder, with your hypothetical about the bus driver with a family history of epilepsy, because I think it illustrates exactly the commission's stance. In that case, you would have the decision made by the employer that was based on the impairment of epilepsy. And so coverage would be established. That's not the same as saying liability would be established. The employer is still perfectly able to make out its claim that the safety risks are too high based on actual medical support, based on actual reasonable medical evidence. And that distinction between coverage and liability, that's what's included in our regulation, 29 CFR Section 1630.2L3, which is set in our brief and which we include in the addendum. It makes that distinction. It's that coverage itself should be fairly easy to establish, but it's liability that it doesn't necessarily flow from coverage. But the point that we're trying to make is if, in this case, the epilepsy was considered prohibitive, then the employer couldn't just rely on unfounded concerns, mistaken beliefs, fears, myths, and prejudices about epilepsy. It would have to be based on actual medical reasonable support. So in my hypothetical, what I was trying to do is set up a situation where you have a person with a predisposition to it. Genetically, it runs deep in your family, but the person does not today have epilepsy. Right, Your Honor, but it's not the predisposition. It's the epilepsy itself that is the impairment at issue. And Your Honor is saying that the— You wouldn't consider the family background at all? Not if it was the impairment itself. He doesn't have anything now. He has no disability now. But there's a potential for all of us to have a disability. I assume that's your position. My position is that if it is the disability that's leading, that's motivating the employer's decision, or I'm sorry, if it's the impairment that's motivating the employer's decision, then coverage is established, and then liability is what's examined. And that was— I mean, the opposing counsel said that this is a new position for us. In fact, this is exactly the position we took in our compliance manual. You'd say in that hypothetical, the individual has been, for purposes of the regarded as prong, they've been regarded as having a disability, even though there's no dispute factually. They don't have epilepsy today. Correct, because disability in the statute has a very specific definition. It's disability based on regarded as impaired, and then turning to regarded as impaired, what that means, the specific definition is included in paragraph 3. In this case, it requires a finding of fact by somebody else, doesn't it? It requires a finding of fact in terms of liability? Yeah. Your Honor, yes, exactly. It requires a finding of fact that the medical evidence supports the risk that the employer is not willing to— All you want is a jury trial in this. Well, I mean, it doesn't need to be a jury trial if the evidence— You mean it could be a bench trial if somebody waived it, right? Well, it could be—I mean, I'm not saying this is what happened here, but it could be decided on summary judgment. If there's evidence in the record of the reasonable, objective medical basis for the employer's concern, and that's uncontradicted, and that's fully supported in the record, then it could be on summary judgment. Then it wouldn't necessarily progress to a bench trial or a jury trial. But here, as we explained in our brief, we don't have that either, because the idea of this substantial increase in risk, that isn't borne out by anything in the record. And, I mean, there's one reference to a study, but there's no indication of why that study is relevant. And there's certainly nothing at all about this idea that these conditions manifest themselves as frequent incapacitation. There's nothing at all concerning that. I'd like to also talk about this alleged inconsistency with prior positions. We've maintained a consistent position with respect to this. Sometimes our focus in an argument might be different based on the facts of that case, as happened in the Massage Envy case, and as happened in the BNSF case in the Ninth Circuit. But we certainly haven't taken any positions that have been inconsistent. Let's see. I guess I would also take issue respectfully with Your Honor's position that a present covered disability is necessary. If you look at the statute, Section 3A, there's nothing about a present disability. It's that the action was taken because of a perceived disability. And there's nothing in there that requires present tense. Yeah, I mean, a lot of that depends on how you read the word being. I'm sorry, which? A lot of that depends upon how you read the word being. Being in? In 1C. 1C. Well, 1C does say it's understood as described in Paragraph 3. Yeah, being regarded as having. You know, you've got to read it as picking up a future tense. Right, but that can be done, as we said in our brief. Having a law degree will be very useful. There's nothing in there that requires it to be having presently. Okay, thank you very much. Thank you very much, Your Honor. Mr. Neal. Yes, but regarded as having a law degree refers to the present. I'll start with the epilepsy example. That person is not covered unless that employer believes that that person at that time already has epilepsy. However, there is another statute that would protect that person in your hypothetical. It's the Genetic Information Nondiscrimination Act because in your hypothetical it relied on family history, and family history is considered genetic information. And so that person would have protection under that statute. But that person is not regarded as having an impairment because there's no perception of a current impairment, and there is no actual current impairment. With respect to Mr. Esposito's argument, I just want to clarify, Dr. Girard did not say that Mr. Schell's high or elevated BMI will cause those conditions. He said, he did say, use words like imminent and the similar words that were described, but they were always preceded by a can or could, and even in the presentation you heard those words. And when you look at the testimony that Mr. Schell cites in his brief, you'll see those words. And Dr. Girard also said it's unpredictable, which is the reason why we need to have the across-the-board practice here for the very reason that it is unpredictable. With respect to the compliance manual that was mentioned by the EEOC, the compliance manual is a guide for internal investigators. It has not been updated since the early 1990s. There's a vague reference in there that EEOC relies on. When you go online and look at that, it does have a 2009 date, but that just means it was updated last 2009, but not that provision. If that has really been EEOC's position,  and certainly under the latest act. With respect, very briefly, to the business necessity defense that EEOC touched on and indicated that we didn't establish that, just to reiterate very quickly, it was based on the admitted facts. You couldn't read to the jury the admitted facts and have any reasonable jury find against us on that. We ask the court to reverse and order the district judge to enter judgment for BNSF. Thank you. Thank you, Mr. Neal. Mr. Esposito, Ms. Horwitz, thank you. The case will be taken under advisement.